# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| FCA US LLC, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) **COMPLAINT** |
| METRO CHRYSLER PLYMOUTH, INC. (D/B/A STAR CHRYSLER JEEP DODGE FIAT), | ) **Civil Action No. 20-1069** ) ) ) |
| Defendant. | ) ) |

## NATURE OF ACTION

Through this civil action, the plaintiff, FCA US LLC ("FCA"), seeks a declaration of its rights and other legal relations, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, that the defendant, Metro Chrysler Plymouth, Inc., d/b/a Star Chrysler Jeep Dodge Fiat ("Star"), has materially breached a reasonable and necessary provision of the parties' agreements, such that FCA has due cause to issue Star a notice of termination; that FCA's sales incentive program, the Volume Growth Program ("VGP"), is lawful under the New York Franchised Motor Vehicle Dealer Act ("Dealer Act"); and that FCA is not violating the Dealer Act or the parties' agreements by selling vehicles to dealers that in turn sell those vehicles to customers who engage auto brokers.

For years, Star has failed to comply with the terms of the parties' agreements, including by failing to meet its contractual Minimum Sales Responsibility and failing to maintain adequate working capital. Seeking to avoid the consequences of its own contractual failings, Star now accuses FCA of breach of contract and violations of the Dealer Act, and claims it is entitled to sales incentive payments it has not earned. As such, FCA seeks a declaration that (i) it has due

cause to issue a notice of termination to Star because Star has materially breached a reasonable and necessary provision of the parties' agreements; (ii) FCA's sales incentive program, the Volume Growth Program, complies with Section 463(2)(g) of the Dealer Act; and (iii) its sale of vehicles to dealers who work with customers that engage auto brokers is lawful under the Dealer Act and in compliance with the parties' agreements.

## PARTIES

1. FCA US LLC is a Delaware limited liability company with its principal place of business in Auburn Hills, Michigan. FCA US LLC has one member, FCA North America Holdings LLC, a Delaware limited liability company with its principal place of business in Auburn Hills, Michigan. FCA North America Holdings LLC has one member, FCA Holdco B.V., a company organized and existing under the laws of the Netherlands with its principal place of business in London, United Kingdom. FCA Holdco B.V. is 100% owned by Fiat Chrysler Automobiles N.V., a publicly traded company organized and existing under the laws of the Netherlands with its principal place of business in London, United Kingdom.

2. FCA is a franchisor as defined in Section 462(8) of the Dealer Act.

3. Star is engaged in the business of purchasing new Chrysler, Jeep, Dodge, and Ram vehicles at wholesale from FCA and reselling them to its retail customers. On information and belief, Star is a corporation organized under the laws of New York with its principal place of business at 211-10 Jamaica Avenue, Queens Village, New York 11428-1541. Star is thus a citizen of New York.

4. Star is a franchised motor vehicle dealer as defined in Section 462(7) of the Dealer Act.

## JURISDICTION AND VENUE

5. This action is brought under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a), 2202. This Court has subject matter jurisdiction over FCA's claims pursuant to 28 U.S.C. § 1332. The amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the parties because FCA is a citizen of Delaware, Michigan, the Netherlands, and the United Kingdom, and Star is a citizen of New York.

6. Star is subject to general and specific personal jurisdiction in this judicial district because Star maintains its principal place of business within the Eastern District of New York.

7. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) and (2) because it is the district where Star conducts business, and in which a substantial part of the events or omissions giving rise to the claim occurred.

## FACTUAL ALLEGATIONS

## SALES AND SERVICE AGREEMENTS

8. FCA sells its new vehicles at wholesale to a network of approximately 2,600 independently-owned dealers located nationwide, who in turn sell these vehicles at retail. All FCA dealers pay the same wholesale price for vehicles of the same make and model.

9. FCA's network of dealers includes Star, which began selling FCA vehicles in 1990. Star is currently operating under four agreements with FCA: A Chrysler Sales and Service Agreement dated July 6, 2004, attached as Exhibit 1 ("Chrysler Agreement"); a Dodge Sales and Service Agreement dated July 6, 2004, attached as Exhibit 2 ("Dodge Agreement"); a Jeep Sales and Service Agreement dated July 6, 2004, attached as Exhibit 3 ("Jeep Agreement"); and a Ram Amendment to the Dodge Sales and Service Agreement, dated May 31, 2012 ("Ram Agreement," and collectively, the "Dealer Agreements").

10. All of the Dealer Agreements incorporate Additional Terms and Provisions. Ex. 1 (Chrysler Agreement) at ¶ 5 ("The additional terms and provisions set forth in the document entitled 'Chrysler Corporation Sales and Service Agreement Additional Terms and Provisions' marked 'Form 91 (C-P-D),' as may hereafter be amended from time to time, constitute a part of this Agreement with the same force and effect as if set forth at length herein, and the term 'this Agreement' includes said additional terms and provisions."); Ex. 2 (Dodge Agreement) at ¶ 5 (same); Ex. 3 (Jeep Agreement) at ¶ 5 ("The additional terms and provisions set forth in the document entitled 'Chrysler Corporation Sales and Service Agreement Additional Terms and Provisions' marked 'Form 91 (J-E),' as may hereafter be amended from time to time, constitute a part of this Agreement with the same force and effect as if set forth at length herein, and the term 'this Agreement' includes said additional terms and provisions.").

11. The Dealer Agreements, including the Additional Terms and Provisions, are fully integrated contracts. Ex. 1 (Chrysler Agreement) at ¶ 6 ("This … Sales and Service Agreement and other documents … which are specifically incorporated herein by reference constitute the entire agreement between the parties relating to the purchase by [Star] of those new specified [FCA] vehicles, parts and accessories … for resale…."); Ex. 2 (Dodge Agreement) at ¶ 6 (same); Ex. 3 (Jeep Agreement) at ¶ 6 (same).

## STAR'S FAILURE TO COMPLY WITH THE TERMS OF THE DEALER AGREEMENTS

12. The purpose of the Dealer Agreements "is to provide a means for the sale and service of specified [FCA] vehicles … in a manner that will maximize customer satisfaction…." Ex. 1 (Chrysler Agreement) at Introduction; Ex. 2 (Dodge Agreement) at Introduction; Ex. 3 (Jeep Agreement) at Introduction.

13. In the Dealer Agreements, Star agreed to "actively and effectively sell and promote the retail sale" of FCA vehicles within its Sales Locality, which is the area designated in writing to Star by FCA as the territory of Star's responsibility for the sale of FCA vehicles. Ex. 1 (Chrysler Agreement) at ¶ 4; Ex. 2 (Dodge Agreement) at ¶ 4; Ex. 3 (Jeep Agreement) at ¶ 4. Where more than one dealer is located within a Sales Locality, the subset of the Sales Locality that comprises the dealer's territory is known as a Trade Zone.

14. Additionally, the Dealer Agreements contain a Minimum Sales Responsibility ("MSR") standard that Star agreed to meet. MSR is detailed in Paragraph 11 of each of the Dealer Agreements, including a description of the methodology used to set MSR.

15. Specifically, Star agreed to "use its best efforts to promote energetically and sell … aggressively and effectively at retail" FCA vehicles to customers within its Sales Locality. Ex. 4 (Chrysler and Dodge Additional Terms and Provisions) at ¶ 11(a); Ex. 5 (Jeep Additional Terms and Provisions) at ¶ 11(a). Star further agreed to "sell the number of new [FCA] vehicles necessary to fulfill [its] [MSR] for each" of the Chrysler, Jeep, Dodge, and Ram lines. Ex. 4 (Chrysler and Dodge Additional Terms and Provisions) at ¶ 11(a); Ex. 5 (Jeep Additional Terms and Provisions) at ¶ 11(a).

16. FCA calculates MSR in the same manner for all FCA dealers. A dealer's MSR is calculated based on FCA's market share, by brand and vehicle segment, in the state in which the dealer operates, applied as a proportion of the total vehicle registration in the dealer's local market, or Sales Locality, and, in local markets where more than one FCA dealer is located, the dealership's assigned "fair share" of the minimum sales opportunity available in its Sales Locality.

17. MSR measures differences in local market demand among Sales Localities, and, where more than one dealer is located in a Sales Locality, within Trade Zones. Two of the ways MSR takes local conditions into account are "fair share" calculations and "slants."

18. Fair share calculations apportion sales responsibility among multiple dealers operating within the same Sales Locality by further dividing the Sales Locality into Trade Zones and taking into account local market conditions in those Trade Zones, including brand popularity in a dealer's market and the opportunity to make sales.

19. FCA also offers adjustments to MSR known as "slants" to account for local market variations. For example, FCA may make a downward adjustment to a dealer's MSR based on specific local conditions, including for unusual and quantifiable sales activity.

20. The Dealer Agreements allow Star to sell "vehicles to customers [within the United States] wherever they may be located." Ex. 1 (Chrysler Agreement) at ¶ 4; Ex. 2 (Dodge Agreement) at ¶ 4; Ex. 3 (Jeep Agreement) at ¶ 4. In other words, although MSR is based on local conditions, Star may sell vehicles to customers in New York but outside of its Sales Locality and to customers outside the state.

21. A dealer's failure to "actively and effectively" sell and promote the retail sale of FCA vehicles is a material breach of the Dealer Agreement for that line-make. Ex. 1 (Chrysler Agreement) at ¶ 4; Ex. 2 (Dodge Agreement) at ¶ 4; Ex. 3 (Jeep Agreement) at ¶ 4; Ex. 4 (Chrysler and Dodge Additional Terms and Provisions) at ¶ 28(b)(ii) (FCA may terminate the agreement for "the failure of [Star] to perform fully any of [its] undertakings or obligations as set forth in this Agreement"); Ex. 5 (Jeep Additional Terms and Provisions) at ¶ 28(b)(ii) (same).

22. A dealer's failure to "use its best efforts to promote energetically and sell … aggressively and effectively at retail" by achieving 100% MSR for a particular line-make is also

a material breach of the Dealer Agreement for that line-make.  Ex. 4 (Chrysler and Dodge Additional Terms and Provisions) at ¶ 11(a), ¶ 28(b)(i) (FCA may terminate the agreement "upon the failure of [Star] to fully perform any of [its] undertakings under Paragraph 11(a) of this Agreement"); Ex. 5 (Jeep Additional Terms and Provisions) at ¶ 11(a), ¶ 28(b)(i) (same).

23. Star has failed to achieve 100% MSR for any line-make for the past several years. The percentages of MSR attained by Star for each line-make over the last five years are:

| Line-Make | 2019 | 2018 | 2017 | 2016 | 2015 |
|---|---|---|---|---|---|
| All | 24.2% | 40.4% | 56.9% | 67.2% | 63.8% |
| Chrysler | 20.3% | 41.7% | 35.9% | 58.2% | 63.1% |
| Jeep | 24.0% | 40.2% | 61.6% | 72% | 64.3% |
| Dodge | 28.4% | 43.1% | 53.6% | 59.0% | 62.2% |
| Ram | 22.4% | 29.6% | 50.0% | 57.7% | 70.4% |

24. Star also agreed in the Dealer Agreements to meet a minimum customer satisfaction standard.  Ex. 4 (Chrysler and Dodge Additional Terms and Provisions) at ¶ 11(b) (Star "shall, at all times during this Agreement, meet its minimum service satisfaction requirements…."); Ex. 5 (Jeep Additional Terms and Provisions) at ¶ 11(b) (same).

25. FCA has measured its dealers' customer satisfaction performance under the Dealer Agreements in a variety of ways over time.  One such way is through use of the Customer Promoter Score ("CPS"), which reports the percentage of customers willing to advocate for and recommend a dealer with respect to sales and service.  Beginning in 2009, Star was to achieve rolling three-month CPS Sales and Service Advocacy scores equal to or greater than the average of Star's National Sales Level Group.

26. Star has consistently failed to meet the customer satisfaction standards it agreed to meet in its Dealer Agreements. For example, Star's Customer Promoter Scores and the averages of Star's National Sales Level Group from December 2018 through March 2019 were:

| Three-Month Score | Sales Advocacy | | Service Advocacy | |
|---|---|---|---|---|
| | Star's CPS | National Sales Level Group Average | Star's CPS | National Sales Level Group Average |
| December 2018 | 93.3% | 94.1% | 55.9% | 82.5% |
| January 2019 | 86.4% | 93.7% | 58.1% | 82.4% |
| February 2019 | 88.2% | 93.8% | 61.5% | 82.7% |
| March 2019 | 90.6% | 94.0% | 68.4% | 83.1% |

27. Star also agreed under the Dealer Agreements to "maintain and employ in connection with [Star's] business such net working capital … necessary for [Star] to carry out successfully [its] undertakings pursuant to" the Dealer Agreements "and in accordance with guides therefor as may be issued by [FCA] from time to time." Ex. 4 (Chrysler and Dodge Additional Terms and Provisions) at ¶ 11(e); Ex. 5 (Jeep Additional Terms and Provisions) at ¶ 11(e).

28. Adequate working capital is based on FCA's Working Capital Guide, which takes into account, among other things, a dealership's size, inventories, and expenses. Pursuant to the Dealer Agreements, "[a]t no time shall [Star's] net working capital be less than the amount specified in the Minimum Working Capital Agreement executed in conjunction with [the Dealer Agreement] … or the amount thereafter established by any superseding Minimum Working Capital Agreement." Ex. 4 (Chrysler and Dodge Additional Terms and Provisions) at ¶ 11(e); Ex. 5 (Jeep Additional Terms and Provisions) at ¶ 11(e). FCA updates its minimum working capital guide for each dealer on an annual basis.

29. It is critical to a dealership's financial health and success that it have adequate working capital to support the business operations being conducted. Failure of a dealer to maintain sufficient working capital is thus a material breach of the Dealer Agreements. Ex. 4 (Chrysler and Dodge Additional Terms and Provisions) at ¶ 28(b)(ii) (FCA may terminate the Dealer Agreements for a dealer's failure to "perform fully any of [its] undertakings or obligations as set forth in this Agreement, including … the undertakings and obligations set forth in Paragraphs 11(b) through 11(g)," which includes the working capital obligations in Paragraph 11(e)); Ex. 5 (Jeep Additional Terms and Provisions) at ¶ 28(b)(ii) (same).

30. Star has consistently failed to maintain the level of working capital to which it agreed under the Dealer Agreements. For example, as of December 2018, Star had working capital of only $221,245, compared to the $3,200,000 it agreed to under the Minimum Working Capital Agreement. Star thus had a working capital deficiency of $2,978,755. *See* Ex. 6 (April 24, 2019 Notice of Default).

31. As of July 2019, Star had working capital of $729,992, compared to its $3,400,000 requirement. Star thus had a working capital deficiency of $2,670,008. Ex. 7 (October 15, 2019 FCA Letter to Star).

32. Star has yet to cure its working capital deficiency. As of February 2020, Star had working capital of $740,207 compared to its $3,400,000 requirement. Star thus has a working capital deficiency of $2,659,793.

## **VOLUME GROWTH PROGRAM**

33. FCA also offers incentive programs to its dealers, including Star. One such incentive program is the Volume Growth Program ("VGP"), which is an objective-based incentive program. VGP provides payments to dealers that choose to participate for vehicles they sell at retail during a specific period, often a month.

34. Participation by a dealer in VGP is purely voluntary. Meeting VGP objectives is not a requirement of the Dealer Agreements. All dealers, including Star, have the option of whether to participate in any incentive program, including VGP. A dealer who does not participate in VGP is not penalized in any way.

35. Dealers have access to VGP program rules and are informed of their VGP sales objectives. The formula for setting VGP sales objectives is the same for all dealers. MSR is not a component of a dealer's VGP objective.

36. A dealer's VGP objective is calculated using many inputs. After a dealer's VGP objective is calculated, something called Market Performance Level ("MPL") may be used to adjust that objective. MPL takes into account, among other factors, the most recent three months of sales data for a dealership calculated at the vehicle line level.

37. MSR and MPL differ in several material respects. For example, while MSR is calculated on a year-to-date basis, MPL is based on a three- or twelve-month rolling basis. Moreover, while MSR is calculated at a vehicle segment level, MPL is calculated by the vehicle line. A dealer may attain the level of sales necessary to qualify for payments under VGP even if it does not achieve 100% MSR.

## NOTICE OF DEFAULT AND THREATS OF LITIGATION

38. FCA has notified Star numerous times over the course of years of its failure to comply with the Dealer Agreements.

39. On April 24, 2019, FCA sent Star a Notice of Default that notified Star of its material breaches of the Dealer Agreements and provided Star with an opportunity to cure those defaults. Ex. 6 (April 24, 2019 Notice of Default) ("Notice of Default"). The Notice of Default

stated that, pursuant to Section 463 of the Dealer Act, Star had 180 days to correct its deficiencies and breaches, and Star would be subject to termination if it failed to do so.

40. In particular, the Notice of Default provided several reasons that Star was in breach of the Dealer Agreements, including that (1) Star has for years failed to meet the sales requirements to which it agreed—i.e., MSR—as to any of the four FCA line-makes; and (2) Star has consistently not maintained adequate working capital or net worth, as it agreed to do under the Dealer Agreements. Ex. 6, April 24, 2019 Notice of Default. The Notice of Default provided Star with information on how it could comply with the terms to which it agreed under the Dealer Agreements.

41. FCA has acted in good faith in providing Star with notice of its deficiencies, and in working with Star to correct those deficiencies. For example, prior to sending the Notice of Default, FCA worked with Star's management over an extended period to address Star's deficiencies, including by conducting periodic in-person MSR reviews and addressing Star's deficiencies in writing on numerous occasions.

42. On July 15, 2019, FCA again wrote to Star, reminding Star to cure its defaults and providing Star with more recent data and information with respect to its performance under the Dealer Agreements. Ex. 8 (July 15, 2019 FCA Letter to Star). For example, the July 15, 2019 letter provided Star with more recent data on its MSR attainment and working capital. As of July 15, 2019, Star had failed to cure its deficiencies as to any of the contractual provisions to which it agreed.

43. On October 15, 2019, FCA provided Star with another reminder of its defaults and the October 31, 2019 deadline for curing those defaults, gave Star updated information on its performance on MSR and working capital, and again notified Star of the levels of performance to

which it agreed under the Dealer Agreements.  Ex. 7 (October 15, 2019 FCA Letter to Star).  FCA also provided Star with information on tools and programs to assist Star in curing its defaults.

44. Despite the extended period of time FCA has spent working with Star's management to address its deficiencies, and despite FCA giving Star the opportunity to cure those defaults after issuing the Notice of Default, Star did not cure its defaults before October 31, 2019, and has not cured its defaults in the time since October 31, 2019.  For example, as of December 2019, Star had achieved only 23.8% of MSR.

45. On January 7, 2020, Star, through its counsel, wrote to FCA, accusing FCA of violating the Dealer Act and "formally declar[ing] FCA in material breach" of the parties' agreements.  Ex. 9 (Star Letter to FCA).

46. Throughout the January 7 letter, Star repeatedly accused FCA of violating the Dealer Agreements and the Dealer Act, including through the use of MSR, CPS, and working capital guides.  Star also claimed that the VGP is unlawful under the Dealer Act.  Ex. 9 (Star Letter to FCA).

47. In the January 7 letter, Star also accused FCA of violating the "New York law" and its "contractual and statutory duties to act in good faith" through "active encouragement and facilitation of brokering activities."  Ex. 9 (Star Letter to FCA).

48. The Dealer Agreements do not prohibit sales to customers who work with brokers.  Accordingly, neither Star nor any other dealer is prohibited by the Dealer Agreements from selling to customers who engage auto brokers to help them with the purchase of a vehicle.

49. Auto brokering is also a legal business authorized and governed by N.Y. Gen. Bus. Law §§ 736-744 (the "Auto Broker Act").  Pursuant to the Auto Broker Act, any

automobile dealer (including an FCA dealer) may sell vehicles to consumers who choose to engage automobile brokers to help them with the purchase of a vehicle.  Under the Auto Broker Act, an auto broker is the "agent, broker, or intermediary for a consumer."  N.Y. Gen. Bus. Law, § 736.

50.     The Dealer Agreements and Auto Broker Act also do not prohibit FCA from allowing dealers who so choose to sell to consumers who engage auto brokers.  To the contrary, nothing in the Dealer Agreements, the Auto Broker Act, or the Dealer Act requires FCA to take any action whatsoever in relation to FCA dealers who choose to sell to consumers who engage auto brokers.

51.     In its January 7 letter, Star demanded that FCA withdraw the April 24, 2019 Notice of Default and cease any efforts to terminate Star's franchises.  It further "demand[ed]" that FCA adjust Star's MSR, customer satisfaction standard, and working capital guideline downward, and pay Star "all incentive monies under VGP that [Star] did not earn."  Star threatened to "vigorously enforce its rights under the Dealer Act and the Dealer Agreements should FCA refuse" to meet these demands.  Ex. 9 (Star Letter to FCA).  On information and belief, Star's reference to "vigorously enforc[ing] its rights" refers to an intention to initiate litigation against FCA.

52.     Star's actions constitute a course of conduct that shows a preparedness and a willingness to litigate, thus creating an actual and justiciable controversy as to the claims brought in this case.

## COUNT I
## Declaratory Judgment That FCA Has Due Cause To Issue A Notice Of Termination Of The Dealer Agreements

53.     FCA incorporates its allegations in Paragraphs 1-52 as if fully stated herein.

54. An actual controversy exists as to whether FCA has due cause to issue a notice of termination of the Dealer Agreements. FCA intends to issue Star notices of termination of the Dealer Agreements, and Star has threatened FCA with litigation should it do so. Star's actions constitute a course of conduct that shows a preparedness and a willingness to litigate, thus creating an actual and justiciable controversy as to the claims brought in this case. In particular, Star has threatened litigation, stating that it "intends to vigorously enforce its rights under the Dealer Act and the Dealer Agreements[.]"

55. The Dealer Agreements between FCA and Star are valid and binding. FCA has at all times complied with its obligations under the Agreements and under the New York Dealer Act.

56. Star has materially breached the Dealer Agreements by, among other things, failing to meet MSR and failing to maintain adequate working capital. The contractual terms that set forth the MSR and adequate working capital requirements are reasonable and necessary provisions of the Dealer Agreements.

57. MSR is not unreasonable, arbitrary, or unfair. FCA takes into account local market conditions when determining MSR for dealers, including Star, and MSR is a lawful sales performance standard under the Dealer Act.

58. FCA has due cause, pursuant to Section 463(2)(d)(1) of the Dealer Act, to issue a notice of termination of the Dealer Agreements because Star has materially breached reasonable and necessary provisions of the Dealer Agreements.

59. FCA provided Star on April 24, 2019, more than 180 days ago, notice of Star's breaches of the Dealer Agreements. FCA at all times acted in good faith in providing notice to Star of its material breaches of the Dealer Agreements and its intent to terminate the Dealer Agreements if Star did not cure the deficiencies.

60. FCA has provided Star, pursuant to Section 463(2)(e)(3), with the requisite notice under the Dealer Act by notifying Star of its breaches and providing it with 180 days to cure those breaches. Star has not cured its material breaches of the Dealer Agreements.

61. To resolve Star's allegations that FCA lacks due cause to terminate the Dealer Agreements and afford FCA relief from the uncertainty and controversy caused by Star's allegations, FCA is entitled to a declaration that FCA has due cause to issue a notice of termination of the Dealer Agreements.

## COUNT II
### Declaratory Judgment That VGP Does Not Violate Section 463(2)(g) Of The Dealer Act

62. FCA incorporates its allegations in Paragraphs 1-61 as if fully stated herein.

63. An actual controversy exists as to whether VGP is lawful under the Dealer Act. Star's actions also constitute a course of conduct that shows a preparedness and a willingness to litigate, thus creating an actual and justiciable controversy as to the claims brought in this case. In particular, Star has threatened litigation, stating that it "intends to vigorously enforce its rights under the Dealer Act and the Dealer Agreements[.]"

64. Section 463(2)(g) of the Dealer Act makes it unlawful for a franchisor, like FCA, to "sell or offer to sell any new motor vehicle to any franchised motor vehicle dealer at a lower actual price therefor than the actual price offered to any other franchised motor vehicle dealer for the same model vehicle similarly equipped…."

65. Section 463(2)(g) also contains a safe harbor provision, which states that the provision "shall not be construed to prevent the offering of incentive programs or other discounts provided such incentives or discounts are reasonably available to all franchised motor vehicle dealers in this state on a proportionately equal basis."

66. All FCA dealers, including Star, pay the same wholesale price for vehicles of the same make and model. FCA does not sell or offer to sell any new motor vehicle to any dealer at a lower wholesale price than to any other dealer.

67. VGP is reasonably available to all FCA franchised motor vehicle dealers, including Star. All dealers, including Star, have the option of whether to participate in VGP. Dealers are informed of their VGP sales objectives and have access to VGP program rules, including the requirements for receiving incentive payments under VGP.

68. VGP is explicitly permitted by Section 463(2)(g) of the Dealer Act. FCA disputes Star's claim that it is violating Section 463(2)(g) of the Dealer Act.

69. FCA has paid Star all incentive payments that Star has earned under VGP. FCA does not owe any money to Star for unearned VGP payments.

70. To resolve Star's allegations that VGP violates Section 463(2)(g) of the Dealer Act and afford FCA relief from the uncertainty and controversy caused by Star's allegations, FCA is entitled to a declaration that VGP is a lawful incentive program under the Dealer Act, and that FCA has complied with, and has not violated, Section 463(2)(g) of the Dealer Act in establishing and implementing VGP.

**COUNT III**
**Declaratory Judgment Regarding Auto Brokering**

71. FCA incorporates its allegations in Paragraphs 1-70 as if fully stated herein.

72. An actual controversy exists as to whether FCA has violated the Dealer Act or the Dealer Agreements by selling vehicles at wholesale to dealers that sell vehicles at retail to customers who engage auto brokers. Star's actions also constitute a course of conduct that shows a preparedness and a willingness to litigate, thus creating an actual and justiciable controversy as to the claims brought in this case. In particular, Star has threatened litigation,

stating that it "intends to vigorously enforce its rights under the Dealer Act and the Dealer Agreements[.]"

73. Auto brokering is a legal business authorized and governed by the Auto Broker Act. Pursuant to the Auto Broker Act, FCA dealers may sell vehicles to consumers who engage automobile brokers to help them with the purchase of a vehicle.

74. FCA does not violate any term of the Dealer Agreements or any provision of the Dealer Act by selling vehicles at wholesale to dealers who in turn sell vehicles at retail to customers who engage auto brokers to assist with that purchase.

75. To resolve Star's allegations that FCA has violated the Dealer Act and the Dealer Agreements and afford FCA relief from the uncertainty and controversy caused by Star's allegations, FCA is entitled to a declaration that it does not violate the Dealer Act or the Dealer Agreements by selling vehicles at wholesale to dealers who sell vehicles at retail to customers who engage auto brokers.

**PRAYER FOR RELIEF**

WHEREFORE, FCA respectfully seeks the entry of a declaratory judgment in its favor and against the defendant that:

1. FCA has due cause to issue a notice of termination of the Dealer Agreements pursuant to Section 463(2)(d)(1) of the Dealer Act because Star has materially breached a reasonable and necessary provision of the Dealer Agreements and has not remedied that breach within 180 days of notification of the breach;

2. FCA has complied with, and has not violated, Section 463(2)(g) of the Dealer Act in establishing and implementing VGP;

3. FCA has complied with, and has not violated, any term of the Dealer Agreements or any provision of the Dealer Act by selling vehicles at wholesale to dealers who in turn sell vehicles at retail to customers who engage auto brokers to assist with that purchase; and

4. FCA should be awarded such other and further relief as the Court deems appropriate, including without limitation, its costs.

DATE: February 27, 2020

Respectfully submitted,

FCA US LLC

By its attorneys,

*/s/ Katherine V. Mackey*
Robert D. Cultice (*pro hac vice forthcoming*)
Felicia H. Ellsworth (*pro hac vice forthcoming*)
Michelle Liszt Sandals (*pro hac vice forthcoming*)
Katherine V. Mackey (NY Bar No. 5350517)
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
robert.cultice@wilmerhale.com
felicia.ellsworth@wilmerhale.com
katherine.mackey@wilmerhale.com
michelle.sandals@wilmerhale.com